FALL v. UNITED STATES (two cases).

(Circuit Court of Appeals, Eighth Circuit. November 28, 1913.)

Nos. 3906, 3907.

1. CONSPIRACY (§ 43*)—SCHEME TO DEFRAUD—INDICTMENT.

Act S. D. March 3, 1905 (Laws 1905, c. 177), provided for an annual appropriation of $10,000 for wild animal bounty, declaring that a bounty of $5 should be paid for the killing of grown wolves, for each mountain lion $3, and for each pup wolf, prairie wolf, or coyote $2, provided the sum of $10,000 was sufficient to do so, and if not then the $10,000 should be paid pro rata upon the claims existing. *Held* that where defendants were indicted for conspiracy to defraud in that they had assisted in the preparation of fraudulent bounty claims, and the indictment alleged that the scheme or artifice was to defraud the state of South Dakota "and divers persons to the grand jury unknown," the fact that the claims for bounty filed that were valid exceeded the appropriation did not render the indictment invalid because under such circumstances it was the holders of good claims that were defrauded and not the state, and that the names of such defrauded claimants were not given.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 79, 80, 84–99; Dec. Dig. § 43.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. INDICTMENT AND INFORMATION (§ 119*)—SURPLUSAGE—CONSPIRACY TO DE-
FRAUD—PERSONS DEFRAUDED.

Where an indictment charged defendants with conspiracy to defraud
the state of South Dakota "and divers persons to the grand jury un-
known" by participating in fraudulent claims for wild animal bounty un-
der Act S. D. March 3, 1905 (Laws 1905, c. 177), and it appeared that, if
the claims alleged to have been fraudulent were all rejected, the ap-
propriation for animal bounty would have been exhausted in payments
made to valid claimants, the allegation that the scheme was to defraud
"divers persons to the grand jury unknown," as well as the state, could be
rejected as surplusage, since the state was none the less defrauded by
the fraudulent claims, though if they had not been filed it would have
paid the appropriation to others.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig.
§§ 311–314; Dec. Dig. § 119.*]

3. POST OFFICE (§ 49*)—MISUSE OF MAILS—INTENT—EVIDENCE.

Pol. Code S. D. § 3118, provides for punishment of any one who shall
"intentionally" evade or violate any of the provisions of the article re-
lating to wild animal bounty, and Penal Code U. S. § 215 (Act March 4,
1909, c. 321, 35 Stat. 1130 [U. S. Comp. St. Supp. 1911, p. 1653]), imposes
punishment on whoever, having devised or intended to devise any scheme
or artifice to defraud or for obtaining money or property by means of
false or fraudulent pretenses, representations, or promises, shall, to ex-
ecute such scheme or artifice, use the mails. Held that, where accused
was indicted for misuse of the mails in furtherance of a scheme to de-
fraud by means of false and fraudulent wild animal bounty claims, the
government introduced proof of a conspiracy to violate the law by filing
assigned claims for bounties, evidence that, when such claims were filed
with accused, the skins referred to were actually present, and when the
claims were certified to the state auditor the skins were clipped as re-
quired by the statute, that defendant's administration of his duties as
auditor with reference to such claims had been the same as had been
followed by his predecessor, and that he had been informed by the chair-
man of the board of county commissioners that he need not keep the
skins for inspection, and that the county attorney had approved assign-
ments, forms, and advised him that assignment of such claims was suffi-
cient, etc., was admissible to negative a fraudulent intent.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec.
Dig. § 49.*

Nonmailable matter, see note to Timmons v. United States, 30 C. C. A.
79; McCarthy v. United States, 110 C. C. A. 548.]

In Error to the District Court of the United States for the District
of South Dakota; James D. Elliott, Judge.

John E. Fall and David A. Fall were convicted of conspiracy to de-
fraud the State of South Dakota and of using the mails in connection
therewith, and they bring error. Reversed and remanded, with di-
rections.

Chambers Kellar, of Lead, S. D. (James G. Stanley, of Lead, S. D.,
and Williams & Sweet, of Rapid City, S. D., on the brief), for plain-
tiffs in error.

Charles C. Houpt, U. S. Atty., of St. Paul, Minn.

Before HOOK and SMITH, Circuit Judges, and AMIDON, Dis-
trict Judge.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

SMITH, Circuit Judge. John E. Fall, David A. Fall, and Francis R. K. Hewlett were tried jointly on an indictment against them and another for conspiracy under Penal Code, § 37, to defraud the state of South Dakota under its statutes relating to bounty. Political Code of South Dakota, §§ 3113 to 3116 and 3121, as amended by Laws 1905, c. 177, and for using the United States mails in connection therewith in violation of section 215 of the Penal Code (Act March 4, 1909, c. 321, 35 Stat. 1130 [U. S. Comp. St. Supp. 1911, p. 1653]). They were convicted, and John E. Fall and David A. Fall brought the case here on error. They sued out separate writs, but as both writs have been submitted upon the same record in the District Court it is agreed that the cases be disposed of together. Hereafter the United States will be treated as the plaintiff and the Messrs. Fall as the defendants.

In 1903 the state of South Dakota passed a law for a state bounty for the killing of wolves and other animals, known as sections 3113 to 3121 of the Political Code. On March 3, 1905 (Laws 1905, c. 177), it passed a substitute for sections 3113, 3114, 3115, and 3121. The statute made a permanent annual appropriation of not to exceed $10,000 not to be disbursed until 30 days after the end of the year. A bounty was to be paid for the killing of grown wolves of $5, for each mountain lion $3, and for each pup wolf, prairie wolf, or coyote, $2, provided the sum of $10,000 was sufficient to do so, if not, then the $10,000 was to be paid pro rata upon the claims existing. Any person desiring to claim bounty was required to present the skin to the board of county commissioners of the county in which the animal had been killed within 30 days of the killing or leave the same within that time with the county auditor and at the same time file his affidavit with the county auditor stating that the animal was killed in the county, by whom and when; that the skin and scalp produced were from the animal on the killing of which the bounty was asked; and that no allowance or bounty had been paid for the killing of such animal. The county commissioners were required to examine the skin and scalp and cut the skin from the lower jaw and burn it, and, if from the affidavit mentioned and the examination of the skin and scalp they found the animal was killed in that county, they should direct the county auditor, under the county seal, to issue to the claimant a certificate, in a form prescribed, to the Auditor of State, which certificate should be filed within 30 days after its receipt by the claimant.

The defendant John A. Fall was auditor of Pennington county, and David A. Fall, his twin brother, was his deputy.

It is quite clear that the statute contemplated that each skin should be presented and the evidence made by the individual who killed the animal, but a practice had grown up in Pennington county during the administration of Fall as county auditor, and possibly anterior thereto, for the one who killed the animal to sell the skin and claim for bounty to some dealer in hides. The hide company would then present the claim to the county auditor or his deputy with an affidavit usually purporting to be signed by the one who killed the animal and with an assignment of the claim for bounty to the hide company purporting also to be signed by the man who killed the animal; the auditor or deputy

auditor would then certify that he had sworn to the affidavit before him and then certify the claim for bounty to the State Auditor. Some of the hide companies in question presented claims for more wolves and coyotes than had been killed by the persons alleged to be claimants. Their conduct seems to have been not only reprehensible but highly fraudulent, and Mr. Hewlett, who represented several of these companies, has, as we understand, been convicted and is now being punished.

A question has arisen as to whether the Falls signed the names of some of the supposed affiants to their affidavits.

W. A. Shurtleff of Parker, S. D., testified sufficiently to admit his testimony, as an expert in handwriting, that the signatures to many of the affidavits and assignments were in the handwriting of the Falls. The conduct of the Falls in certifying that men appeared and swore to affidavits before them that did not so appear is of course reprehensible, and if they in addition signed the names of supposed affiants their conduct is still more subject to condemnation, but it does not conclusively follow that they were guilty of the conspiracy to defraud the state of South Dakota and used the mails in connection therewith.

[1] Complaint is first made that the indictment charges that the scheme and artifice was to defraud the state of South Dakota and divers persons to the grand jury unknown. It is contended that, as the claims filed that are undoubtedly correct exceeded the appropriation, the fraud was not upon the state of South Dakota but upon those other claimants, and the names of the defrauded claimants should have been given, if known, and it is further insisted that they must have been known. Appellants cite Durland v. United States, 161 U. S. 306, 16 Sup. Ct. 508, 40 L. Ed. 709; Coffin v. United States, 156 U. S. 432, 15 Sup. Ct. 394, 39 L. Ed. 481; Milby v. United States, 109 Fed. 638, 48 C. C. A. 574. We cannot agree that any of these cases even tend to sustain the defendant's contention.

If it is alleged in such a case that the parties were to the grand jury unknown, that is presumed in the first instance to be true. It is conceded a demurrer which was filed to the indictment could not raise this question, but it is claimed that their motion in arrest of judgment should have been sustained. There was substantially no evidence of who the righteous claimants were, and substantially no more appeared upon the trial in this regard than appeared in the indictment, but the fact, if it appeared before the close of the trial, who the wronged parties were would not show that the grand jury had such knowledge accessible when it returned the indictment.

In the very case of Coffin v. United States, 156 U. S. 432, on page 452, 15 Sup. Ct. 394, on page 402 (39 L. Ed. 481), the court quotes with approval from Commonwealth v. Sherman, 13 Allen (Mass.) 248, 250, to the effect that:

"It is always open to the defendant to move the judge before whom the trial is had to order the prosecuting attorney to give a more particular description, in the nature of a specification or bill of particulars, of the acts on which he intends to rely, and to suspend the trial until this can be done; and such an order will be made whenever it appears to be necessary to enable the defendant to meet the charge against him, or to avoid danger of injustice.

Commonwealth v. Giles, 1 Gray [Mass.] 469; The King v. Curwood, 3 Ad. & El. 815; Rosc. Crim. Ev. (6th Ed.) 178, 179, 420."

[2] But entirely aside from this question this court is of the opinion that under the circumstances of this case "and divers persons to the grand jury unknown" may be wholly rejected as surplusage. If the state could have been compelled to pay out the money to some one else if not to the hide dealers in question, if it was fraudulently induced to pay it to the hide dealers the state was no less defrauded because it would have otherwise paid the money to some one else. If this fraud in fact existed, it was a fraud upon the state of South Dakota. Haas v. Henkel, 216 U. S. 462, 30 Sup. Ct. 249, 54 L. Ed. 569, 17 Ann. Cas. 1112.

[3] The defendant John E. Fall on the stand was asked by the defendants' counsel whether the skins referred to in the various affidavits, assignments, and certificates were actually present at the time they certified to the fact that affidavits were sworn to before them, and when they certified the claims to the State Auditor, and were then clipped by them. It was sought to show by him that he was deputy auditor before he became auditor, and that the practice of the auditor was to take and accept claims in the names of others than those who presented the skins and to issue certificates on assignments filed to parties other than those who had killed the animals, and that the practice was followed by him; that the board of county commissioners had approved the method in which the business was transacted and the chairman of the board told him he need not keep the skins for inspection of the board; that he consulted the county attorney for Pennington county as to the form of assignment used and the county attorney advised him that the assignment was sufficient and authorized him to issue the certificate to the State Auditor; that he never had any thing to do with procuring any of these assignments; that he never issued any certificates to the State Auditor unless there was at the time presented the skins of the animals to the number stated in the certificate, and there was also exhibited to him at the time the assignment of the claim for bounty; that he never received any compensation, pay, reward, or consideration whatever on account of any wolf bounty claims which were certified to the State Auditor aside from statutory fees as provided by law; that, the assignments being there and the skins, he did not think any person would be defrauded at the time he issued the certificate. All this evidence was excluded upon the objection of the government. This we think was error.

Section 3118 of the Political Code of South Dakota provides a punishment of any one who shall "intentionally evade or violate any of the provisions of this article." Section 215 of the Penal Code provides for the punishment of whoever having devised or intending to devise any scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises and shall for the purpose of executing such scheme and artifice use the mails.

These defendants were charged under Penal Code 37 with conspiracy to violate section 215. The indictment specially charges that the

offense was committed, and that defendants did intend to cheat and defraud the state of South Dakota, and that it was "intended" to be made effective by the use of the mails. If these and similar allegations had been omitted, the indictment would probably have been defective. Evans v. United States, 153 U. S. 584, 14 Sup. Ct. 934, 38 L. Ed. 830.

"Although an evil or malicious mind or will is necessary to the commission of most offenses, it is not necessary in all cases to aver a guilty intent as a substantive part of the crime in giving its technical description in an indictment or information. In those cases in which the act necessarily includes the intent, it is sufficient to aver the act in apt and technical terms and the intent will be inferred. But where the common law or statute makes a particular intention essential, or there is an attempt, not accomplished, to do a criminal act, and the evil intent only can be punished, it is then necessary to allege the intent with directness and precision, although there are cases in which an attempt to commit a willful and malicious crime imports ex vi termini an intent to commit that crime. A specific intent which is made part of the offense by the statute creating it must be charged, as where the intent with which an act is done brings it within a statute punishing as a felony that which at common law was a misdemeanor, or where an act is criminal only if done with a particular intent." 22 Cyc. 329.

Here the question is not one of criminal pleading but of evidence. Would the evidence rejected have tended to refute any of that offered by the government or any just inference that might be drawn therefrom? In this case there was no direct evidence of any conspiracy. The proof of that rested upon circumstances. More than usually in criminal cases the condition of the minds of the Falls was important. It is laid down that in conspiracy there must be intentional participation in the transactions with a view to the furtherance of the common design or purpose. There must have been a scheme or artifice to defraud. What does this mean? Does it not include the intention to defraud? Even in a civil case under the bankruptcy law the Supreme Court has held that under section 67e, in determining whether a conveyance was made with the intent and purpose to hinder, delay, and defraud creditors, the intent is the very essence of the offense. The intent is the gist of the right to avoid a transfer. Coder v. Arts, 213 U. S. 223, 29 Sup. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008.

Of course we do not mean that in ordinary cases ignorance of the law or a conscientious conviction that the law was unjust or the like would defeat a conviction. Reynolds v. United States, 98 U. S. 145, 25 L. Ed. 244. What we do mean is that an intention to take part in a conspiracy is always essential to the commission of the crime of conspiracy, and, where it is charged that the conspiracy was to defraud some other person, an intention to defraud is essential. It is said that to constitute a crime the act must, except in the case of certain statutory crimes, be accompanied by a criminal inent or by such neglect and indifference to duty or consequences as is regarded by the law as equivalent to a general intent. An act does not make a man guilty unless he be so in intention, but this is not the exact rule on which we rely. A man is presumed to intend the natural and ordinary results of his own acts, and consequently if one does an unlawful act it is presumed that it was done with a criminal intention, but this pre-

sumption is not a conclusive one and may be rebutted by the defendant.

> "There are certain crimes of which a specific intent to accomplish a particular purpose is an essential element, and for which there can be no conviction upon proof of mere general malice or criminal intent. In these cases it is necessary for the state to prove the specific intent by either direct or circumstantial evidence." 12 Cyc. 152.

What is here announced is that, where the government relies upon circumstances to prove a conspiracy or the devising of a scheme and artifice to defraud, the case comes within that class where an intent different from the ordinary criminal intent must be shown. Here the government called numbers of witnesses by whom affidavits purported to be on file of the killing of a number of animals in excess of those which they testified upon the trial they had killed. This was a circumstance tending to show a conspiracy and by inference at least tended to show that the number of skins shown in the affidavit were not before the auditor when he made his certificate to the State Auditor. If it had appeared that, when an affidavit and assignment were filed with the county auditor, a corresponding number of skins were then and there exhibited to him and he clipped them, that in the auditor's experience as deputy under his predecessor it had been the practice, upon the presentation of an affidavit apparently signed by the man who killed the animals and his assignment, to certify to his affidavit and to issue a certificate to the State Auditor, that, while the law of South Dakota required the skins to be deposited for inspection by the board of county commissioners, they or their chairman had told him that it was unnecessary to keep these skins for their inspection, and that he consulted the law officer of the county and he advised him that the assignment was sufficient to authorize him to issue the certificate to the State Auditor, that he never had anything to do with procuring any of these assignments, that he never received any compensation, pay, reward, or consideration for certifying these claims, all this would have tended greatly to weaken the contention of the government that the auditor and his deputy were parties to the conspiracy, if one existed. See People v. Flack et al., 125 N. Y. 325, 26 N. E. 267, 11 L. R. A. 807, where an elaborate note will be found on this subject of intent down to 1890; Wharton's Criminal Evidence (10th Ed.) pp. 901, 906, 1685, 1698, and 1771; Potter v. U. S., 155 U. S. 438, 439, 15 Sup. Ct. 144, 39 L. Ed. 214; Rudd v. U. S., 97 C. C. A. 462, 173 Fed. 912.

It follows that the judgment in both cases is ordered reversed, and the causes remanded, with directions to the trial court to set aside the verdict and grant a new trial.