## LANDEN v. UNITED STATES. KATZ v. SAME. MILLER v. SAME.

(Circuit Court of Appeals, Sixth Circuit. May 7, 1924.)

### Nos. 3954–3956.

1. **Criminal law ⟨⟩15—No prosecution after repeal of statute creating offense at common law, but different by statute.**
    At common law, after a statute creating an offense was repealed without a saving clause, there could be no further criminal prosecution for its violation, and even prosecutions pending at date of repeal were abated, and this included repeal by implication; but this has been changed by Rev. St. § 13 (Comp. St. § 14).

2. **Criminal law ⟨⟩21—Conscious intent to break law not essential, where act mala prohibita.**
    With regard to those acts which are not mala in se, but which through legislative exercise of police power have become mala prohibita, no conscious intent to break any law is essential, and accused need not even know that law exists.

3. **Conspiracy ⟨⟩23—Corrupt intent must exist.**
    To be guilty of conspiracy to commit an act malum prohibitum, corrupt intent is necessary.

4. **Conspiracy ⟨⟩23—Persons illegally selling intoxicating liquor without corrupt intent were not guilty of conspiracy.**
    Wholesale druggists, selling intoxicating liquor for nonbeverage purposes, in purported pursuance of National Prohibition Act, tit. 2, § 6 (Comp. St. Ann. Supp. 1923, § 10138½c), without corrupt intent to violate regulations of Treasury Department limiting sales, could not be guilty of conspiracy under Criminal Code, § 37 (Comp. St. § 10201).

In Error to the District Court of the United States for the Western Division of the Southern District of Ohio; John W. Peck, Judge.

George R. Landen, George Katz, and Sidney H. Miller, respectively, were convicted of conspiracy to violate National Prohibition Act by

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

selling intoxicating liquor for nonbeverage purposes without necessary permit, and bring error. Reversed.

The defendants, wholesale druggists, were convicted of a conspiracy to violate section 6 of title 2 of the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138½c), by selling intoxicating liquor for nonbeverage purposes, but without the necessary permit. The indictment is complicated, but it was construed by the trial court as dependent upon the theory that the respondents' permit allowed only a limited amount of sales, and that their plan to violate the law and their actual violations involved making sales beyond and above the limitation. It will answer all presently useful purposes to confine our examination to this feature of the case. Respondents were actively connected with the Independent Drug Company, a corporation which had long been regularly conducting a wholesale drug business at Cincinnati. This company had a store in which it carried on such business in the usual way, and where is carried such stock as would be customary for wholesale druggists, including some intoxicating liquor. On March 11, 1921, the company applied on form 1,404, for a permit to sell intoxicating liquors for nonbeverage purposes. Upon this application a 1,405 permit was issued by the federal prohibition commissioner, under date of June 28, 1921. This permit gave general, and prima facie unlimited, permission to sell for other than beverage purposes to others holding proper permits to purchase, and was to be in force until December 31, 1921, "unless revoked or renewed as provided by law or regulation." Such quantitative limitation as there may be in the permit, must be imported through the clause, "This permit is granted subject to any conditions which may be adopted by the Bureau in connection with the distribution of liquor at wholesale," or the clause, "This permit is granted under the conditions that the provisions of the National Prohibition Act and regulations issued thereunder, will be strictly observed."

At the time the permit issued, the whole subject of sales at wholesale was covered by article IX of regulation 60 of the Internal Revenue Department. After the Independent Drug Company had conducted its business under the permit for a time, section 58 in article IX was amended by a pronouncement of the Internal Revenue Department, approved by the Secretary of the Treasury and called "Treasury Decision 3,208." This amended article or regulation took effect August 15th. It covers five pages of the printed record. The clause of limitation, found just before (a), and which has become a controlling feature of this case, is as follows: "No wholesale druggist shall be permitted to procure, or withdraw, or sell potable liquor, not including high-proof alcohol, during any one month in an aggregate amount greater than 10 per cent. (measured in dollars and cents) of his entire average monthly bona fide drug business sales (an exchange of any part of his stock or the exchange of any goods or property is not a sale) during the quarter immediately preceding the first day of the month during which he proposes to withdraw, procure or sell, unless he shows to the satisfaction of the Commissioner that such excess quantity is reasonably required for the legitimate purposes of his business. The average monthly sales during the quarter mentioned shall be arrived at by taking the aggregate sales for the three months and dividing the same by three. The computation of the entire wholesale sales shall not include any sales of potable liquor or high-proof alcohol. In making application for withdrawal of potable liquor the wholesale druggist shall certify to the average sales during the previous quarter to show whether or not his applications cover liquors, measured in dollars and cents, in excess of 10 per cent. of his sales."

This limitation continued in force until March 7, 1922, on which date it was superseded by Treasury Decision 3,299, reading as follows: "The paragraph immediately preceding subdivision (a) of section 58 of regulation No. 60, as amended by T. D. 3,208, of August 3, 1921, is hereby amended to read as follows: A wholesale druggist shall be permitted to procure or withdraw potable liquor, not including high-proof alcohol, to an amount equal to 10 per cent. (measured in dollars and cents) of his bona fide drug business sales during his past year. He shall not be permitted to acquire additional

amounts of potable liquor during the succeeding 12-months period unless he shall show to the satisfaction of the Commissioner that such excess quantity is required for the legitimate needs of his business."

The District Judge confined the proof to sales made between August 15, 1921, and March 7, 1922. Within this period the Drug Company continued its business at its Cincinnati store, and no complaint is made in that connection. During the same period, it had to do with liquor sales not at its store and of three different characters:

First. It sold warehouse receipts, and had nothing to do with tax payments or withdrawals by the purchaser. It is conceded that such sales were permitted by section 3 of the act, that no permit was required therefor, and that they were not a violation of any regulation.

Second. It sold to other wholesale druggists who were authorized to purchase liquors, selling upon a wine gallon tax-paid basis, and carried out such sales by appropriating thereto warehouse receipts which it owned, and upon which it proceeded to pay the taxes and make withdrawals, in the name of its customer, and through the instrumentality of these warehouse receipts. In some cases it sent the receipts to the customer, who indorsed and returned them; in other cases it had one of its clerks write the name of the customer upon the back of the receipt. The customer furnished to the distillery the regular 1,410 permit, with the name of the distillery as consignor, but made payment to the Independent Drug Company.

Third. In still other cases, the Independent Drug Company, owning warehouse receipts, tax-paid the whisky and put it in the distillery free warehouse. It then made sales thereof to other wholesale druggists, who forwarded their 1,410 permits to the distillery, with the distillery appearing as consignor, and the shipments were made accordingly; but the purchase price was paid to the Drug Company. In this third class there was no appearance of transfer of the warehouse receipt to the purchaser.

It is conceded that the sales in the second and third class, or even in the third class alone, made during the period in question, far exceeded the 10 per cent. limitation sought to be imposed by Treasury Decision 3,208.

Jos. S. Graydon, of Cincinnati, Ohio, Levi Cooke, of Washington, D. C., and James B. O'Donnell, of Cincinnati, Ohio, for plaintiffs in error.

Thomas H. Morrow and R. T. Dickerson, Sp. Asst. Attys. Gen. (Benson W. Hough, U. S. Atty., of Columbus, Ohio, on the brief), for the United States.

Before DENISON and DONAHUE, Circuit Judges, and SIMONS, District Judge.

DENISON, Circuit Judge (after stating the facts as above). It is urged that merely to violate a regulation made by the Commissioner of Internal Revenue under the purported authority of section 7 of the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138½cc) does not constitute such a crime or offense against the United States as to support a prosecution for conspiracy under section 37 of the Criminal Code (Comp. St. § 10201). U. S. v. Eaton, 144 U. S. 677, 12 Sup. Ct. 764, 36 L. Ed. 591. It is also urged that, in so far as Treasury Decision 3,208, undertook to prevent wholesale druggists, otherwise authorized, from selling more than a limited quantity of intoxicating liquor made before the Prohibition Act was passed, it was invalid, and reliance is had upon the opinion of the Attorney General, dated March 3, 1921, holding that the act did not indicate any intention to permit executive officers to limit the amount of existing liquors which could legally be sold for medicinal purposes, as well as upon the known lim-

itations of the departmental right to make regulations, as stated in Williamson v. U. S., 207 .U. S. 425, at page 462, 28 Sup. Ct. 163, 52 L. Ed. 278, and other similar cases. Indeed, it is said that the repeal of so much of Treasury Decision 3,208 as limited the amount of sales, which repeal was effected by Treasury Decision 3,299, was made because this opinion of the Attorney General was then so interpreted.

Each of these two contentions, as well as some others presented, we pass by without consideration,[1] and come to (1) the effect of the repeal'; and (2) the defense resting on a good-faith belief by the respondents that their adopted plan of business was not contrary to this regulation.

[1] 1. It was a familiar common-law rule that, after a statute creating an offense was repealed without a saving clause, there could be no further criminal prosecution for its violation, and even prosecutions pending at the date of the repeal were abated. In the federal courts this rule was extended to the case of that repeal by implication which comes from passing an inconsistent statute (U. S. v. Tynen, 11 Wall. 88, 20 L. Ed. 153); but, even if there were effective analogy between such a statutory repeal and the present change of regulations, we observe that this common-law rule is no longer in force. The Act of February 25, 1871 (R. S. § 13 [Comp. St. § 14]), is a complete saving clause as to all later statutes which do not reject it (Gt. Northern R. R. v. U. S., 208 U. S. 452, 28 Sup. Ct. 313, 52 L. Ed. 567), and covers all offenses (U. S. v. Reisinger, 128 U. S. 398, 9 Sup. Ct. 99, 32 L. Ed. 480).

[2-4] 2. It is settled that with regard to criminal prosecutions for those acts which are not mala in se, but which through legislative exercise of the police power have become mala prohibita, no conscious intent to break any law is essential. The respondent need not even know that the law exists. Shevlin v. Minnesota, 218 U. S. 57, 68, 30 Sup. Ct. 663, 54 L. Ed. 930; U. S. v. Balint, 258 U. S. 250, 252, 42 Sup. Ct. 301, 66 L. Ed. 604; Armour v. U. S., 209 U. S. 56, 85, 86, 28 Sup. Ct. 428, 52 L. Ed. 681. When, however, the prosecution is for conspiracy, the text-books and elementary discussions seem to agree that there must be a "corrupt intent," which is interpreted to be the mens rea, the conscious and intentional purpose to break the law. Bishop's Criminal Law (8th Ed.) §§ 297, 300; 12 C. J., p. 552, § 16; 5 R. C. L. p. 1066, § 6.[2] The principle that even a mistake of law may protect one accused of crime has familiar illustration in the rule that, if the respondent in a prosecution for larceny, took the property

---

[1] We also note. though it was not argued, a query whether the quoted paragraph is a direct restriction upon sales or only upon the granting of permits. It does not say that no druggist shall sell, but that no druggist shall be "permitted" to sell, and it is in connection with the granting of permits. The last clause clearly contemplates the employment of the restriction upon an application for a permit (though it mentions only withdrawals). The paragraph also states its measure with indirect reference to "the month during which he proposes to withdraw, procure or sell." This language is appropriate only to the problem of granting a permit.

[2] For an informing review of the background of prosecutions for criminal conspiracy, see Criminal Conspiracy, by Francis B. Sayre, 35 Harv. Law Rev. 393.

in a good-faith, though erroneous, belief that he had the legal right to its possession, he is not guilty. See many cases to this effect collected in note, 41 L. R. A. (N. S.) 550–554—e. g. under a claim of legal exemption from execution (People v. Schultz, 71 Mich. 315, 38 N. W. 868); under a claim that the owner had forfeited by not marking (Debbs v. State, 43 Tex. 650); under a claim that finding gave him title (7 Mees. & W. 623).[3] The principle was applied to conspiracy in People v. Powell, 63 N. Y. 88, 91, 92. In a careful opinion by Judge Andrews, the difference between the intent involved in the substantive offense, which intent the law will imply from the act, and the "corrupt intent" necessary to make conspiracy, which intent does not necessarily follow from a plan to do the act, is clearly pointed out. The case has stood for 50 years as the leading one on the subject, and if it be confined, as it is (page 92), to a plan to do an act "innocent in itself," it has never, so far as we find, been questioned.[4] The principle was again announced and affirmed in a conspiracy case in People v. Flack, 125 N. Y. 324, 333, 26 N. E. 267, 11 L. R. A. 807, though the propriety of its application to the facts of that case seems dubious. See, also, Fall v. U. S. (C. C. A. 8) 209 Fed. 547, 553, 126 C. C. A. 369.

We find nothing which goes further in modifying the generality of this principle than the decision of this court in the Chadwick Case, 141 Fed. 225, 243, 72 C. C. A. 343, to the effect that knowledge of the law which prohibits an act "of evil design and wrongful purpose" will be imperatively imputed to the respondents, or the decision of the Second Circuit Court of Appeals in the Hamburg-American Case, 250 Fed. 747, 758, 759, 163 C. C. A. 79, to the effect that, where the act to be done is malum in se, it is not controlling that the respondent does not in fact know of the specific prohibitory act. The principle of these two decisions does not reach a case where the contemplated act is not inherently wrongful, where the prohibitory statute is ambiguous, where there is good reason for both lawyers and laymen to think that the act planned is not prohibited, and where the respondent plans and does the act in the actual belief, supported by good-faith advice of counsel, that it is a lawful act. In such a situation the conclusion that the respondent has a "corrupt intent" to violate the law is, in our judgment, one repugnant to the fundamental principles of justice, and not to be adopted unless under the compulsion of authoritative decisions. We find nothing requiring such adoption.

Is the defense presented in this case of the character we have described as being sufficient? The obvious purpose of Treasury Decision 3,208 was to prevent those who were not, in fact, wholesale druggists from masquerading under that name. While they could sell only to retail druggists or other wholesale druggists, yet there was manifest propriety in not permitting some one who desired to deal in liquor to

---

[3] See "Ignorance and Mistake in the Criminal Law," by Edwin R. Keedy, 22 Harv. Law Rev. 75, 89.

[4] In the Hamburg-American Case, infra, the object of the conspiracy was not "innocent" but "dishonest and fraudulent"; in such a situation the conspirators must take the chance whether there is any law forbidding their contemplated fraud.

set himself up in the business of a wholesale druggist, though having no established continuing business of that type. Such a subterfuge could be prevented by a rule that, in the conduct of his liquor business, ostensibly in connection with and as a part of the wholesale drug business, a due relation should be observed between the principal and the incident. These considerations have no bearing upon dealings with warehouse certificates. Section 3 of the act prohibited any burdensome regulation in such dealing. The business conducted by the defendants, so far as it was not merely in warehouse certificates, was more analogous to such dealings than to the ordinary business of wholesale druggists. The transaction by which defendants sold the warehouse certificates and the purchaser tax-paid and withdrew, the transaction by which the defendants tax-paid and withdrew under their warehouse certificates and then sold the liquor so withdrawn, and the transaction of intermediate nature, whereby the withdrawal was in the name of the purchaser, are all of substantially the same ultimate effect, and have the same final bearing in their effect, upon the prohibitory law. Where the law expressly authorizes the first, and it is claimed that the regulations under the law prohibit the third, and perhaps the second, the claim challenges careful attention. It may be right; but that it is so should clearly appear.

The system of permits provided for by regulation 60, of which T. D. 3,208 was amendatory, is far from clear. It prescribes (section 7) that "permits to sell * * * also confer the right to procure liquor upon furnishing permits to purchase," whatever that means; also that "permits to purchase * * * convey the right to procure." It contemplates that permits to sell shall be on form 1,405 and permits to purchase on form 1,410. We held in Smulyan v. U. S., 283 Fed. 293, that where the seller was not engaged in that business, and had made only a single sale, the purchaser's 1,410 was a sufficient permit under the law. The permit issued in this case to the Drug Company purported to be a 1,405, and contained no express limitations; but its foundation application, to which it referred, specified that the maximum quantity of intoxicating liquor to be received during any quarterly period shall be less than 476 gallons. It is to be assumed from the proofs received or offered that the wholesale druggists who continued as wholesale druggists under the National Prohibition Act had commonly been wholesale dealers under the former internal revenue law and were familiar with the procedure thereunder. The revenue acts provided that distilleries and wholesale dealers should each keep, records on 52A and 52B of all liquors received into and sent out from their places of business. Regulation 60, in section 58 (g), as amended by T. D. 3,208, provided that:

"Each manufacturer must keep at his free warehouse at the place of manufacture * * * record 52; and each wholesale druggist shall keep at his place of business record 52. There shall be kept at each distillery * * * and wholesale druggists' establishment * * * a permanent file containing a copy of each permit to purchase, upon which deliveries of intoxicating liquor have been made or are to be made from such place."

It had been a long time and familiar practice under the old revenue law, and continued to be the customary practice under the Prohibition

Act, for wholesale druggists to keep record 52 at their wholesale drug establishment covering all receipts and deliveries from that establishment; but when they sold liquor at the distillery, or from the free warehouse, and where it was shipped out with the distillery appearing as consignor, to have the same entered only upon the distillery record 52. This had been with the acquiescence and approval of the government agencies. This clause (g) and this practice plainly recognize the existence of two methods of sale, from the "establishment" and from the distillery.

Again, we observe in (a) of section 58, T. D. 3,208:

"The title to such tax-paid liquor may be transferred by means of warehouse receipts or certificates, but all persons conveying title by means of such receipts must hold permits, and pay special taxes, and keep record 52."

This is not of clear application; but it is not inappropriate to at least part of defendants' sales exdistillery. · It tends to indicate that sales from drug store stock and sales from distillery free warehouses were effectively differentiated.

We also find in (c) of section 58 that, in filing an application for a permit, the wholesale druggists must specifically set forth "the kind and maximum quantity of each kind of liquor to be held at any one time." This is simple and workable, if "to be held" refers only to what is to be held in the drug store stock; it is complicated and somewhat unworkable, if it refers to what is to be held in the distillery free warehouses, in connection with dealings in warehouse receipts or certificates.

Passing from the environment and coming to the precise language of the limiting clause first above quoted from T. D. 3,208, and upon which the prosecution depends, it says: "No wholesale druggists shall be permitted to procure or withdraw or sell, etc." True, the disjunctive and not the conjunctive is used; but this may well be accounted for by a desire not to confine the limitation to the joint act of procuring and selling, but to reach either so long as it pertains to maintaining the stock in the drug establishment in due condition in spite of continuing procurements and sales. We think this clause is capable of the construction that it was intended to refer only to business done at the drug establishment, and not to business continued in the customary way through shipments made by the distillery under its permits. We do not intend to adopt that construction of this clause, but only to say that it may be so interpreted with no more disregard of its literalness than is often approved in statutory construction.

By this construction its meaning is completely reconciled with the legitimate purpose of the regulation; and the validity of the regulation becomes at least less doubtful, under the Attorney General's opinion above cited, than if it were construed to extend to distillery sales having no connection with the status of the permittees as good-faith druggists.

Upon the trial it was consistently ruled that the respondents interpreted this regulation at their peril, and that no amount of good faith in following the advice of counsel, and no mistake in solving any am-

biguity in the regulation could serve as a defense. We think this was error, and it requires reversal and new trial. The other questions arising on the trial are so complicated by admixture with this one that they cannot well be discussed upon this record.