RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0171p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

                    *Plaintiff-Appellee*,

    *v.*

DANIEL DARIO TREVINO,

                    *Defendant-Appellant*.

No. 20-1104

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:18-cr-00166-1—Paul Lewis Maloney, District Judge.

Argued: January 28, 2021

Decided and Filed: July 30, 2021

Before: COOK, GRIFFIN, and LARSEN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Stuart G. Friedman, Southfield, Michigan, for Appellant. Joel S. Fauson, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Stuart G. Friedman, Southfield, Michigan, for Appellant. Joel S. Fauson, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

───────────────

## OPINION

───────────────

LARSEN, Circuit Judge. Daniel Trevino was the sole owner of a chain of marijuana dispensaries throughout Michigan. A federal jury convicted him of conspiracy and nine substantive marijuana offenses. He challenges those convictions and his sentence.

But first, Trevino argues that he never should have been charged.  He invokes a congressional appropriations rider, known as the Rohrabacher-Farr Amendment, or "Section 538," that bars the Department of Justice from spending funds to "prevent" states from "implementing their own State laws" permitting medical marijuana.  *See* Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, § 538, 128 Stat. 2130, 2217 (2014).  The parties dispute the rider's effect; but even if we construe Section 538 as broadly as Trevino asks us to, he is not entitled to the relief he seeks.

Next, to counter the conspiracy charge, Trevino invokes a published opinion from nearly a century ago, *Landen v. United States*, 299 F. 75 (6th Cir. 1924).  *Landen* created a limited exception to the general rule that ignorance or mistake of law is no excuse.  We have applied that exception exactly once—in *Landen* itself; yet, we have never overruled it.  Whatever life remains in the decision, it cannot help Trevino here because his conduct falls far outside of *Landen*'s narrow scope.

Finally, Trevino challenges the denial of his counsel's motion to withdraw—filed less than two weeks before trial—the government's use of summary charts at trial, and the procedural and substantive reasonableness of his sentence.  These challenges, too, are unavailing.

Finding all of Trevino's claims without merit, we AFFIRM.

I.

Daniel Trevino was the founder and sole owner of Hydro World, LLC (Hydroworld), a Michigan entity.  Originally, Hydroworld sold fertilizer and indoor growing equipment, such as lights and hydroponics systems.  But after the state passed the Michigan Medical Marihuana Act (MMMA), Trevino turned Hydroworld into a marijuana dispensary.

A.

1.

Passed by state ballot initiative in 2008, the MMMA allows state-licensed "qualifying patient[s]" and "primary caregiver[s]" to possess limited quantities of marijuana for medical

purposes if they meet certain conditions.[1]    Mich. Comp. Laws § 333.26424(a)–(b); *People v. Hartwick*, 870 N.W.2d 37, 41 (Mich. 2015).    Relevant here, individuals who have been convicted of a drug-related felony cannot become caregivers.    Mich. Comp. Laws § 333.26423(k).

Each patient may have only one caregiver.  *Id.* § 333.26426(d).  Each caregiver may have up to five patients, who must be connected to the caregiver via the state registration process.  *Id.*; *see State v. McQueen*, 828 N.W.2d 644, 655 (Mich. 2013).    Caregivers may possess up to 2.5 ounces of usable marijuana and up to 12 marijuana plants per patient.  Mich. Comp. Laws § 333.26424(b)(1)–(2).  Patients, likewise, may possess up to 2.5 ounces of marijuana and may cultivate up to 12 plants for personal use if they have not already specified that their caregiver is growing the plants for them.  *Id.* § 333.26424(a).  Michigan law does not protect the sale of medical marijuana between patients.[2]  *See McQueen*, 828 N.W.2d at 654–57.

2.

State law aside, marijuana remains illegal under federal law.    Under the Controlled Substances Act (CSA) of 1970, 21 U.S.C. § 801 *et seq.*, it is a crime "to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA." *Gonzales v. Raich*, 545 U.S. 1, 13 (2005) (citing 21 U.S.C. § 841(a)(1)).  Marijuana is one such controlled substance.  21 U.S.C § 812(c).

Adding a wrinkle to the federal landscape is an appropriations rider known as the "Rohrabacher-Farr Amendment" or "Section 538."  Congress has included this rider in every annual appropriations bill passed since December 2014.  In relevant part, it reads:

---

[1]Recreational marijuana remained illegal under Michigan law until 2018.  *See* Mich. Comp. Laws § 333.27951 *et seq.*  Michigan now permits limited distribution, possession, and use of recreational marijuana with similar quantity limitations.  *See id.* § 333.27955.  The charged conduct here occurred before this change in Michigan law.

[2]Marijuana dispensaries that operated based on patient-to-patient sales also were not protected under the MMMA.  *McQueen*, 828 N.W.2d at 654–57.  In 2016, Michigan enacted the Medical Marihuana Facilities Licensing Act, *see* Mich. Comp. Laws § 333.27101 *et seq.*, which established a licensing scheme to allow qualified entities to facilitate transactions between patients and caregivers.  *See id.* §§ 333.26424a, 333.27102(w), 333.27206. That statute came into effect after most of the conduct at issue here; Trevino's Hydroworld never had such a license.

> None of the funds made available in this Act to the Department of Justice may be used, with respect to the State[] of . . . Michigan . . . [and other named states and the District of Columbia,] to prevent such States from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana.**[3]**

Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, § 538, 128 Stat. 2130, 2217 (2014). Despite this rider, Congress has left the relevant parts of the CSA unchanged.

### B.

Trevino's marijuana dispensaries operated openly at several storefronts across Michigan. Hydroworld retail locations would sell marijuana to customers with a state-issued patient card. Hydroworld stocked its inventory via bulk purchases from various outside growers. And Trevino and his employees also grew some of the marijuana for Hydroworld.

Trevino was a registered patient under the MMMA, but he was not a registered caregiver. As his own counsel admitted, Trevino "could never have been licensed" as a caregiver because he had a prior felony conviction involving cocaine. *See* Mich. Comp. Laws § 333.26423(k).

Trevino's dispensaries quickly attracted attention from state law enforcement. State authorities conducted controlled purchases at Hydroworld's stores and executed search warrants at Hydroworld retail and storage locations, at Trevino's home, and at the homes of some of his employees. Then federal investigators got involved. In 2016, the Drug Enforcement Agency executed search warrants at two Hydroworld stores, at one of Trevino's residences, and at the home of one of Trevino's employees.

The state and federal searches recovered marijuana plants, processed marijuana, sales logs, cash, and other marijuana-related items. The converted drug weight for the marijuana seized and admitted at trial was 111 kilograms. The purchase logs indicated that Hydroworld had sold at least an additional 315 kilograms. Hydroworld continued to operate as a marijuana dispensary during and after these searches. It closed in December 2017.

---

**[3]**The rider has been reenacted annually using substantially the same language. *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. No 116-260, § 531, 134 Stat. 1182, 1282–83 (2020).

A federal grand jury charged Trevino with nine substantive marijuana offenses and one count of conspiracy to manufacture, distribute, and possess marijuana with intent to distribute. 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vii), (b)(1)(D), and 846. The indictment alleged that the conspiracy lasted "[f]rom in or about 2010 until in or about December 2017." The substantive offenses consisted of five counts of maintaining a drug-involved premises, *id.* § 856(a)(1), (b), three counts of manufacturing marijuana, *id.* § 841(a)(1), (b)(1)(B)(vii), (b)(1)(D), and one count of possessing marijuana with intent to distribute, *id.* § 841(a)(1), (b)(1)(D). A jury convicted Trevino on all ten counts. The district court sentenced him to 188 months' imprisonment, which was the bottom of his Sentencing Guidelines range. He timely appealed.

II.

Trevino begins by arguing that he should not have been prosecuted at all. In the district court, Trevino moved to quash the indictment, arguing that, in light of Section 538, the Department of Justice was violating the Appropriations Clause of the Constitution by spending money to prosecute him.[4] The Appropriations Clause dictates that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Trevino requested "that the Indictment be quashed unless and until the government establishes the authority of the Drug Enforcement Administration and the Department of Justice to expend federal funds on [his case]."[5] The district court and both parties on appeal characterize the motion as a request for injunctive relief.

---

[4]Whether Trevino truly complains of a constitutional violation, or whether his claim is more appropriately understood as a claim that the Department of Justice acted in excess of its statutory authority, is at least open to debate. *See Dalton v. Specter*, 511 U.S. 462, 474 (1994); *Sierra Club v. Trump*, 963 F.3d 874, 910–11 (9th Cir. 2020) (Collins, J., dissenting), *majority opinion vacated sub nom.*, *Biden v. Sierra Club*, ___ S. Ct. ___, 2021 WL 2742775 (July 2, 2021). But the resolution of that question makes no difference to our resolution of this case.

[5]We express no opinion here on whether Section 538 impermissibly interferes with the prosecutorial role of the executive. *See United States v. Nixon*, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case."). For one argument that it does, see Daniel Martin, Note, *The Duty to Appropriate: Why Congress Has a Constitutional Obligation to Fund Criminal Law Enforcement*, 106 Calif. L. Rev. 511, 536–37 (2018). For additional pertinent commentary, see also *Constitutionality of the Rohrabacher Amendment*, 25 Op. O.L.C. 161, 165–70 (2001) (disputing the constitutionality of an appropriations rider that would prevent the executive branch from arguing for certain interpretations of a treaty in court); J. Gregory Sidak, *The President's Power of the Purse*, 1989 Duke L.J. 1162 (discussing the boundaries between Congress's power of the purse and the executive's constitutional obligations and prerogatives); Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1351 (1988).

The district court analyzed Trevino's motion using an approach outlined by the Ninth Circuit, the only circuit so far to address the significance of Section 538. *See United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016). In *McIntosh*, the Ninth Circuit held that, when private individuals have "strictly compl[ied]" with state laws concerning medical marijuana, prosecuting them for federal marijuana offenses would "prevent" states from "implementing" their medical marijuana laws. 833 F.3d at 1176–78. Therefore, the court concluded that such individuals should receive the protection of the rider. *Id.*

The Ninth Circuit then remanded the cases before it for evidentiary hearings to determine whether the defendants' conduct had been "completely authorized by state law." *Id.* at 1179. But it declined to decide "exactly how the district courts should resolve claims that DOJ is spending money . . . in violation of an appropriations rider." *Id.* at 1172 n.2. And, although it suggested that defendants who had "strictly complied" with state medical marijuana laws might be entitled to an order enjoining the Department of Justice from spending funds on their prosecutions,[6] *id.* at 1173, 1179, it also declined to take a "view on the precise relief required . . . leav[ing] that issue to the district courts in the first instance," *id.* at 1172 n.2. *See also id.* at 1179.

In the present case, the district court followed the Ninth Circuit's approach and determined that Trevino should be afforded a hearing at which he would bear the burden of showing his "strict compliance" with the MMMA. *Accord United States v. Evans*, 929 F.3d 1073, 1076–77 (9th Cir. 2019) (placing the burden of proof on the defendant to show strict compliance). Trevino then requested use immunity for his testimony at this hearing. The district court denied that request, holding that the government would be allowed to use any testimony Trevino might give as part of its case-in-chief at trial. Trevino then elected not to testify at the

---

[6]We express no definitive view on the Ninth Circuit's suggestion that the best way to think of a motion like Trevino's is as a request for injunctive relief. Injunctions against criminal prosecutions are highly disfavored. *Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177, 187 (3d Cir. 2006); *Deaver v. Seymour*, 822 F.2d 66, 68–70 (D.C. Cir. 1987). The Ninth Circuit acknowledged this in *McIntosh*, but it attempted to distinguish these cases by explaining that any injunction would be against *expenditures* on the prosecution, not the prosecution itself. *McIntosh*, 833 F.3d at 1172. That is a curious line. The prosecution cannot continue without expenditures. The Anti-Deficiency Act prohibits any government official from carrying out the prosecution on an unpaid, volunteer basis. 31 U.S.C. § 1342.

pretrial hearing, and he presented no other evidence. So, the district court denied the "motion to quash" and allowed the prosecution to proceed.

On appeal, Trevino argues that the district court erred by assigning him the burden to show his compliance with state law. Citing *Simmons v. United States*, 390 U.S. 377 (1968), he also contends that, by denying his request for use immunity, the district court forced him to make an intolerable choice between his Fifth Amendment privilege against self-incrimination and testifying on the issue of state-law compliance.

The government disagrees on both fronts and, in addition, asks us to hold that Section 538 bars spending only for the prosecution of state actors, not private individuals.

We think Trevino's claim capable of a more straightforward resolution. We may assume, though we do not decide, that Section 538 is as robust as the Ninth Circuit suggested in *McIntosh*; that is, we may assume that Section 538 prohibits expenditures for the prosecution of individuals who have "strictly complied" with state medical-marijuana law. *See* 833 F.3d at 1179. But even making that assumption, Trevino cannot show an entitlement to the remedy he seeks: a new evidentiary hearing, using his requested procedural safeguards, to determine whether his actions had "strictly complied" with Michigan law. To obtain an evidentiary hearing, "a defendant must make a least some initial showing of contested facts." *United States v. Giacalone*, 853 F.2d 470, 483 (6th Cir. 1988).[7] But the undisputed facts show that Michigan law did not authorize Trevino's conduct.

In the district court, Trevino claimed that "Hydroworld was set up and designed to comply with the affirmative defense of Section 8 in the Michigan Medical Marihuana Act." Section 8 of the MMMA provides "patient[s]" and "primary caregiver[s]" who meet certain conditions an affirmative defense to state marijuana prosecutions. Mich. Comp. Laws § 333.26428; *Hartwick*, 870 N.W.2d at 55–57. Section 8 requires a defendant to prove three elements by a preponderance: "(1) The existence of a bona fide physician-patient relationship,

---

[7]The defendant's threshold showing that "an evidentiary hearing should be held in the first place" is distinct from the question of "[w]ho bears the burden of production and persuasion at the evidentiary hearing." *Giacalone*, 853 F.2d at 483. Because we conclude that Trevino failed to show any contested facts, we need not decide who would bear the burden of proof or persuasion at an evidentiary hearing in this context.

(2) in which the physician completes a full assessment of the patient's medical history and current medical condition, and (3) from which results the physician's professional opinion that the patient has a debilitating medical condition and will likely benefit from the medical use of marijuana to treat the debilitating medical condition." *Hartwick*, 870 N.W.2d at 57.

Even if Trevino would have offered evidence about those three requirements at the pretrial hearing (no detailed proffer is in the record), he could not have met the threshold requirement of being a "primary caregiver." "[T]o be eligible to raise a defense under § 8 . . . an individual must either be a 'patient' or the 'primary caregiver' for no more than five qualifying patients, as those terms are defined and understood under the MMMA." *People v. Bylsma*, 889 N.W.2d 729, 740–41 (Mich. Ct. App. 2016). The statutory definition of "primary caregiver" precludes anyone with a prior felony drug conviction from holding that status. Mich. Comp. Laws § 333.26423(k). Trevino has a felony conviction involving cocaine. Trevino was not— and never could have been—registered as a primary caregiver. He has never disputed this, and his appellate counsel admitted as much at oral argument.

And even though Trevino was registered as a "patient" under the MMMA, Section 8 pertains only to marijuana-related activity aimed at "treat[ing] or alleviat[ing] *the patient's* serious or debilitating medical condition or symptoms of [that] condition." Mich. Comp. Laws § 333.26428(a)(3) (emphasis added). Trevino was not charged with using marijuana personally. And Michigan law does not permit patient-to-patient marijuana sales. *McQueen*, 828 N.W.2d at 654–57. Thus, a Section 8 defense was unavailable to Trevino as a matter of law.

Because the undisputed facts establish his noncompliance with Michigan law, Trevino was not entitled to whatever protections—if any—that Section 538 might provide, or to a hearing on his claim. The Ninth Circuit has recognized that a pretrial hearing in this context is unnecessary if there is no factual dispute as to state-law compliance. *See, e.g.*, *United States v. Hoffman*, 740 F. App'x 129, 130 (9th Cir. 2018) (finding that "a *McIntosh* hearing was unwarranted" where the defendant admitted in his plea agreement that he "'was involved in a conspiracy to grow marijuana for profit,' precluding any basis for finding that he was in compliance with state law"); *United States v. Gloor*, 725 F. App'x 493, 495 (9th Cir. 2018) (similar); *United States v. Kleinman*, 880 F.3d 1020, 1028–29 (9th Cir. 2017) (similar). And "we

are not aware of any context in which we have held that a defendant is entitled to an evidentiary hearing without making 'at least some initial showing of contested facts.'" *United States v. Shields*, 850 F. App'x 406, 410 (6th Cir. 2021) (quoting *Giacalone*, 853 F.2d at 483).

In this case, Trevino has made no such showing. No additional facts produced at a hearing could have shown that Trevino was MMMA-compliant. The undisputed facts establish that he was not.

III.

Before trial, the government became concerned that Trevino would try to gain an acquittal by suggesting, among other things, that his conduct was the product of ignorance or mistake of law. The government, therefore, moved *in limine* to exclude any evidence or arguments about these topics as irrelevant and unduly prejudicial. The district court granted the government's motion. Trevino argues that this ruling was in error. We review evidentiary rulings for an abuse of discretion, asking "whether the district court (1) misunderstood the law . . . , (2) relied on clearly erroneous factual findings, or (3) made a clear error of judgment." *United States v. Chavez*, 951 F.3d 349, 357–58 (6th Cir. 2020).

In support of his claim, Trevino asks us to consider the scope and continued vitality of one of our little-known Prohibition-era cases, *Landen v. United States*, 299 F. 75 (6th Cir. 1924). Trevino reads *Landen* to say that he should have been allowed to present the jury with evidence that he believed his actions were legal. Such evidence, Trevino argues, would have negated the intent element of the conspiracy charge.

Twenty-first century practitioners in the field of criminal law might be surprised to hear such a defense. After all, "[t]he general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system." *Cheek v. United States*, 498 U.S. 192, 199 (1991). The Supreme Court has recognized an exception to this rule only when "highly technical statutes," such as tax or banking statutes, require a "willful" violation of the law.[8] *United States v. Roth*, 628 F.3d 827, 835–36 (6th Cir. 2011) (quoting

---

[8]Trevino cites a separate line of cases in which the Supreme Court has implied a *mens rea* requirement in certain statutes that do not include one. *See Staples v. United States*, 511 U.S. 600, 619 (1994); *Morissette v. United*

*Bryan v. United States*, 524 U.S. 184, 194–95 (1998)); *see Ratzlaf v. United States*, 510 U.S. 135, 138 (1994).

We have upheld countless conspiracy convictions, including under the CSA, without ever mentioning *Landen* or suggesting that conspiracy requires any greater criminal intent than the offense that is its object.[9] *See, e.g.*, *United States v. Powell*, 847 F.3d 760, 780–81 (6th Cir. 2017) (finding sufficient evidence to support a marijuana distribution conspiracy charge); *United States v. Soto*, 794 F.3d 635, 657 (6th Cir. 2015); *United States v. Javaherpour*, 78 F. App'x 452, 454–56 (6th Cir. 2003) (rejecting defendant's argument that he should have been able to present a mistake-of-law defense to federal drug charges); *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999); *United States v. Khalife*, 106 F.3d 1300, 1303 (6th Cir. 1997); *United States v. Collins*, 78 F.3d 1021, 1038 (6th Cir. 1996) ("The intent element of [18 U.S.C.] § 371 does not require the government to prove that the conspirators were aware of the criminality of their objective . . . .").

"[T]he fundamental characteristic of a conspiracy is a joint commitment to an 'endeavor which, if completed, would satisfy all of the elements of [the underlying substantive] criminal offense.'" *Ocasio v. United States*, 136 S. Ct. 1423, 1429 (2016) (second alteration in original) (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)). Conspiracy is a specific intent crime. *United States v. Merriweather*, 78 F.3d 1070, 1078 (6th Cir. 1996). Specific intent requires something more than "the knowing commission of an act that the law makes a crime." *United States v. Kimes*, 246 F.3d 800, 807 (6th Cir. 2001) (quoting *United States v. Kleinbart*, 27 F.3d 586, 592 n.4 (D.C. Cir. 1994)). The specific intent required for conspiracy is intent to further the

---

*States*, 342 U.S. 246, 273–76 (1952); *see also Liparota v. United States*, 471 U.S. 419, 425 (1985). But this judicially implied element requires only proof of the defendant's knowledge of the *facts* that made the conduct illegal, not knowledge of the governing law. *See Morissette*, 342 U.S. at 271 ("He must have had knowledge of the facts, though not necessarily the law, that made the taking a conversion."); *United States v. Elshenawy*, 801 F.2d 856, 859 (6th Cir. 1986) ("[T]he government here is only required to show that Elshenawy knew the physical nature of what he possessed . . . . The government was not required to prove that Elshenawy knew that Michigan requires that cigarette taxes be paid . . . ."). And in any event, these cases relate only to criminal statutes that lack any express *mens rea* requirement. *United States v. Dean*, 705 F.3d 745, 749 (7th Cir. 2013). The substantive offense that was the object of Trevino's conspiracy does have a statutory *mens rea* element. *See* 21 U.S.C. § 841(a). So these cases are inapposite.

[9]To our knowledge, only one district court decision in our circuit has ever relied on *Landen*. *See United States v. Reminga*, 493 F. Supp. 1351, 1360–61 (W.D. Mich. 1980).

conspiracy's "common unlawful objective." *Merriweather*, 78 F.3d at 1078 (quoting *United States v. Mitchell*, 49 F.3d 769, 775 (D.C. Cir. 1995)). At least as a general matter, the government is not required to prove that the conspirators knew that their objective was criminal. *See Collins*, 78 F.3d at 1038 (citing *Ingram v. United States*, 360 U.S. 672, 678 (1959)). The government must prove only that the conspirators acted with "at least the degree of criminal intent necessary for the substantive offense" that was the object of the conspiracy. *United States v. Feola*, 420 U.S. 671, 686 (1975) (citing *Ingram*, 360 U.S. at 678); *see United States v. Tipton*, 269 F. App'x 551, 555 (6th Cir. 2008) (recognizing that charging a conspiracy to commit a different underlying offense could alter the *mens rea* requirement).

Against this modern understanding, Trevino advances two propositions. First, he maintains that *Landen* took a different view, under which he would be entitled to relief. Next, he says that under our "prior precedent" rule, the century-old decision still binds us today. *See Darrah v. City of Oak Park*, 255 F.3d 301, 309 (6th Cir. 2001) (explaining that, when two of our published decisions conflict, "[t]he prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the [prior] decision or this Court sitting en banc overrules the prior decision" (quoting *Salmi v. Sec'y of Health & Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985))). We need not decide whether *Landen* still controls, because the narrow rule announced in *Landen* does not cover Trevino's case.

We agree with Trevino on one point: *Landen* held that conspiracy *does* sometimes require proof that the defendant knew his conduct was unlawful. 299 F. at 79. But the critical question is: when? Trevino says that such proof is required whenever the object of the conspiracy is to commit an offense that is *malum prohibitum* ("prohibited by statute, although . . . not necessarily immoral") rather than *malum in se* ("inherently immoral, such as murder, arson or rape"). *See Malum prohibitum*, Black's Law Dictionary (11th ed. 2019); *Malum in se*, Black's Law Dictionary (11th ed. 2019). Here we disagree. *Landen*'s rule is more restrictive than that.

In discussing the criminal intent required for the crime of conspiracy, *Landen* adopted a species of what has been called the "corrupt motive doctrine" or, more commonly, the "*Powell* doctrine," after the 1875 New York Court of Appeals case that was its progenitor. *See generally*

*People v. Powell*, 63 N.Y. 88, 92–93 (1875); 2 Wayne R. LaFave, Substantive Criminal Law § 12.2(c)(5) (3d ed. Oct. 2020 update). In *Powell*, the defendants were officers of a charity. *Powell*, 63 N.Y. at 89. State law required the charity to publicly solicit bids before making certain purchases. *Id.* at 89–91. The charity's officers, unaware of this rule, were convicted for conspiring to violate it and took an appeal. *Id.* at 91. The New York Court of Appeals acknowledged that ignorance or mistake of law is generally no defense. *Id.* at 92. But the court found an exception "implied in the meaning of the word conspiracy." *Id.* "Mere concert is not conspiracy," the court said, and "[p]ersons who agree to do an act innocent in itself, in good faith and without the use of criminal means, are not converted into conspirators, because it turns out that the contemplated act was prohibited by statute." *Id.* Without additional explanation, the court concluded that ignorance of the law negates the criminal intent required for conspiracy when the object of the conspiracy is *malum prohibitum*. *Id.* at 92–93.

The *Powell* doctrine has few fans today. To his credit, Trevino acknowledges the criticism. *See, e.g.*, *United States v. Cohen*, 260 F.3d 68, 72–73 (2d Cir. 2001) (finding the doctrine to have "little resolving power in particular cases" and to "serve[] mainly to divert attention from clear analysis of the *mens rea* requirements of conspiracy" (citation omitted)); *United States v. Mack*, 112 F.2d 290, 292 (2d Cir. 1940) (L. Hand, J.) (declaring that it is "hard to see any reason" for the *Powell* doctrine); *see also* Model Penal Code § 5.03 editors' explanatory note ("The mens rea [for conspiracy] does not include, however, a corrupt motive or an awareness of the illegality of the criminal objective."). But a century ago, when the *Powell* doctrine was in vogue, we embraced a version of it in *Landen*. 299 F. at 79.

The defendants in *Landen* were "wholesale druggists" convicted of conspiring to sell intoxicating liquor in violation of the National Prohibition Act. *Id.* at 76. The liquor they sold was for medicinal purposes, and they had a federal license to sell it. *Id.* But they unwittingly violated limitations on the amount they could sell due to a complex update to already-complex federal liquor regulations. *Id.* at 76–77. We reversed their convictions, using *Powell* as our starting point. *Id.* at 79, 81–82. In doing so, we rejected as dicta statements in two previous cases that had appeared to reject the *Powell* doctrine, *Chadwick v. United States*, 141 F. 225, 243 (6th Cir. 1905), and *Hamburg-American Steam Packet Co. v. United States*, 250 F. 747, 759 (2d

Cir. 1918). We reasoned, in part, that the objects of the conspiracies charged in those cases were *mala in se*, whereas the Prohibition regulations at issue in *Landen* were *mala prohibita*. 299 F. at 79.

But that was not the sum of our reasoning. Instead, *Landen* was quite clear that ignorance or mistake of law could defeat a charge of conspiracy only "[1] where the contemplated act is not inherently wrongful, [2] where the prohibitory statute is ambiguous, [3] where there is good reason for both lawyers and laymen to think that the act planned is not prohibited, and [4] where the respondent plans and does the act in the actual belief, supported by good-faith advice of counsel, that it is a lawful act." *Id.*

The ambiguity and complexity of the regulatory regime was central to the *Landen* decision. Indeed, after briefly discussing *Powell*, *Chadwick*, and *Hamburg-American*, the opinion focuses almost exclusively on the confounding nature of the regulations at issue. *See id.* at 79–82. *Landen* explained at length that the statute and underlying regulations "challenge[d] careful attention," that the system of granting liquor permits was "far from clear," and that the record-keeping requirements for permit holders were "not of clear application." *Id.* at 80–81. Thus, in *Landen*, we were not content to grant relief based only on the determination that the criminal charges involved a conspiracy to commit a *malum prohibitum* offense.[10] Assuming that *Landen* survives, its narrow version of the *Powell* doctrine applies only when its four prerequisites are satisfied. *See id.* at 79.

That is not the case here. In contrast to the Prohibition-era regulations at issue in *Landen*, there is no ambiguity in the CSA's conspiracy provision, 21 U.S.C. § 846, or in the substantive offenses that were the object of Trevino's conspiracy. Trevino was convicted of conspiracy to "knowingly or intentionally . . . manufacture, distribute, . . . or possess with intent to . . . distribute . . . a controlled substance." *Id.* § 841(a)(1). Nothing about this statute is

---

[10]*Landen*'s focus on the intricate and opaque nature of the Prohibition regulations bears at least some resemblance to modern cases holding that a defendant does not "willfully" violate a "highly technical statute[]" unless he has "knowledge of the law." *See Bryan*, 524 U.S. at 193–95. However, these more recent cases do not necessarily support *Landen*'s viability today. *Landen* did not involve a statutory "willfulness" requirement.

"ambiguous" or could have provided "good reason for both lawyers and laymen to think that the act planned [wa]s not prohibited." *See Landen*, 299 F. at 79.

Trevino's counsel conceded at oral argument that the CSA itself is unambiguous, but he suggested that state law (the MMMA), in conjunction with the federal appropriations rider (Section 538), supplies the ambiguity that *Landen* requires. This argument fails for at least three reasons.

First, the MMMA is a state statute. And it is an elementary feature of our federal system that a state statute cannot override or amend federal law. *See* U.S. Const. art. VI, § 2 ("[T]he Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."). For good measure, the Supreme Court has spoken specifically about the interaction between state law and the federal CSA.[11] *See Raich*, 545 U.S. at 29 (explaining that, under the Supremacy Clause, "marijuana possession and cultivation in accordance with state law" is not "beyond congressional reach" (internal quotation marks omitted)). There is no ambiguity in the relationship between the MMMA and the CSA.

Second, Section 538 did not alter the CSA's substance. The Supreme Court has said that Congress may amend substantive law in an appropriations rider, but the rider must do so "clearly." *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 440 (1992). And "[t]he doctrine disfavoring repeals by implication . . . applies with even *greater* force when the claimed repeal rests solely on an Appropriations Act." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978). Though Section 538 purports to temporarily deny funding for the prosecution of certain crimes, the rider's text contains no suggestion that the substantive conduct prohibited by the CSA has now been made legal. Thus, even if Section 538 validly denies funding for the prosecution of certain conduct, that conduct remains criminal nonetheless. 21 U.S.C. § 841; *see United States v. Nixon*, 839 F.3d 885, 888 (9th Cir. 2016) ("As . . . *McIntosh* makes clear, the CSA continues

---

[11]We also note, in passing, that the MMMA has always been clear that individuals with felony drug convictions, like Trevino, cannot serve as "caregivers" under state law. Mich. Comp. Laws § 333.26423(k). Trevino had no good reason to think his conduct was legal under federal *or* state law.

to apply in all 50 states, although the DOJ's ability to use certain funds to pursue individual prosecutions under that statute remains circumscribed . . . ."). There is no ambiguity here either.

Third, Trevino was charged with a conspiracy spanning from 2010 until 2017. But Congress did not enact Section 538 until December 2014. *See* 128 Stat. at 2130. So even if Section 538's passage had introduced some ambiguity into federal law, Trevino's conspiracy had been underway for about four years beforehand. Trevino cannot claim that he was confused by a law that did not yet exist. Accordingly, even if *Landen* still governs, Trevino cannot satisfy each of its elements.

Our holding today creates no conflict with the rulings of our sister circuits. To our knowledge, no other circuit currently recognizes the *Powell* doctrine, even in the weak form espoused by *Landen*. *See, e.g.*, *United States v. Sclamo*, 578 F.2d 888, 891 (1st Cir. 1978); *Cohen*, 260 F.3d at 71–72; *United States v. Brooks*, 681 F.3d 678, 699 & n.17 (5th Cir. 2012); *United States v. Thomas*, 887 F.2d 1341, 1346–47 (9th Cir. 1989); *United States v. Blair*, 54 F.3d 639, 643 (10th Cir. 1995); *United States v. Cuni*, 689 F.2d 1353, 1356 (11th Cir. 1982). Some have even deemed the doctrine foreclosed by a pair of Supreme Court cases, *Ingram v. United States*, 360 U.S. 672 (1959), and *United States v. Feola*, 420 U.S. 671 (1975). *See, e.g.*, *Brooks*, 681 F.3d at 699 & n.17; *Blair*, 54 F.3d at 643; *see also United States v. Schafer*, No. CR. S-05-238 FCD, 2007 WL 2121734, at *2 (E.D. Cal. July 24, 2007) ("The drug conspiracy statute, 21 U.S.C. § 846, is substantially the same as [18 U.S.C. § 371], and thus, the court applies *Feola* here."). But because we conclude that *Landen*'s limited version of the *Powell* doctrine does not apply here, we have no need to decide whether *Ingram* and *Feola* command its demise.

Whatever the vitality of *Landen*, Trevino's offenses were well outside that decision's narrow scope. Therefore, the district court did not err when it granted the government's motion to exclude evidence related to Trevino's belief that his conduct was legal.

IV.

Trevino next challenges the district court's denial of his counsel's motion to withdraw, arguing that it interfered with his constitutional right to counsel of choice. The Sixth Amendment protects "the right of a defendant who does not require appointed counsel to choose

who will represent him." *United States v. Gonzales-Lopez*, 548 U.S. 140, 144 (2006) (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988)). Yet "the right to counsel of choice 'is circumscribed in several important respects.'" *Id.* (quoting *Wheat*, 486 U.S. at 159). "Among those limitations is the trial court's discretion 'in balancing the right to counsel of choice against the needs of fairness' and 'the demands of its calendar.'" *Powell*, 847 F.3d at 777 (quoting *Gonzales-Lopez*, 548 U.S. at 152). We review a district court's denial of a motion to substitute counsel for an abuse of discretion, considering four factors: "(1) the timeliness of the motion, (2) the adequacy of the [trial] court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) . . . the public's interest in the prompt and efficient administration of justice." *United States v. Steele*, 919 F.3d 965, 973 (6th Cir. 2019) (quoting *United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001)). All four factors support the district court's decision to deny the motion here.

First, the motion to withdraw was not timely. On August 6, 2019, Trevino fired his trial counsel, asserting dissatisfaction with the number of pretrial motions he had lost. Trevino's counsel moved to withdraw the next day, just thirteen days before trial and five days before the final pretrial conference. We have often concluded that motions to withdraw filed so close to trial are untimely. *See, e.g.*, *United States v. Parenteau*, 529 F. App'x 532, 536 (6th Cir. 2013) (two weeks); *United States v. Osuji*, 413 F. App'x 603, 607 (6th Cir. 2011) (one month); *United States v. Williams*, 176 F.3d 301, 314 (6th Cir. 1999) (two weeks); *see also United States v. Chambers*, 441 F.3d 438, 447 (6th Cir. 2006) (one-and-a-half months, where discovery had closed nearly a year earlier). And Trevino can claim no special need to change counsel so close to trial; most of the unfavorable pretrial rulings that Trevino complained of had been issued more than six months earlier.

Second, the record shows that the district court made a sufficient inquiry. The court received briefing from both parties, heard arguments from both sides at the final pretrial conference, and paused that conference to conduct an *ex parte* hearing about Trevino's concerns. The court allowed Trevino to explain his position and allowed his attorney to respond.

*Cf. Chambers*, 441 F.3d at 447.  The trial court devoted significant attention to the motion to withdraw.

Third, the conflict between Trevino and his counsel did not rise to the level of "a total lack of communication."  *See Mack*, 258 F.3d at 556.  Trial counsel proved to be a vigorous advocate and continued to communicate with his client throughout the litigation.  *Cf. United States v. Herrera*, 636 F. App'x 250, 255 (6th Cir. 2016); *Williams*, 176 F.3d at 314.  Their real disagreement concerned whether to defy court orders.  In the same order that excluded defenses based on ignorance or mistake of law, the district court had also forbidden Trevino from suggesting jury nullification at trial.  During the *ex parte* hearing, it became clear that Trevino was unhappy with his counsel's insistence that they respect the court's ruling in both regards.  No replacement counsel would have been able to pursue Trevino's preferred strategy.

Fourth, the public's interest in the prompt and efficient administration of justice weighed against withdrawal.  Allowing Trevino to retain new counsel would have caused significant delay.  A substantial continuance would have been necessary to allow new counsel to prepare for trial.  The case involved detailed evidence, gathered over the course of several years of state and federal investigations.  More than twenty witnesses were scheduled to testify, including one who would be traveling internationally.  The district court had already continued the trial date three times.  In similar cases, we have found that the public's interest in the efficient administration of justice weighs against allowing withdrawal.  *See, e.g.*, *Herrera*, 636 F. App'x at 255–56; *United States v. Whitfield*, 259 F. App'x 830, 834 (6th Cir. 2008) (citing *United States v. Pierce*, 60 F.3d 886, 891 (1st Cir. 1995)).

All four factors supported the denial of the motion to withdraw.  We find no abuse of discretion.

V.

Next, we turn to Trevino's challenge to the government's use of summary charts at trial. The charts summarized Hydroworld's marijuana sales records from various retail locations between December 2010 and March 2016.  The charts accounted for 315 of the 426 total kilograms of marijuana admitted at trial.  Trevino argues that it was error to admit these charts

into evidence because the underlying sales records used to create them are inadmissible hearsay that would not have qualified for the business records exception. *See* Fed. R. Evid. 801(c), 802, 803(6), 1006; *United States v. Moon*, 513 F.3d 527, 545 (6th Cir. 2008) (listing the requirements for the use of summaries, including that "the underlying documents must be admissible in evidence"). The district court's decision to allow use of the summary charts is an evidentiary decision that we review for an abuse of discretion. *Chavez*, 951 F.3d at 357–58.

We agree with the government that the underlying records would have been admissible under the business records exception; it was not error, therefore, to admit the charts summarizing those records.

The business records exception applies when the following five conditions are satisfied:

(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).

Two of Trevino's co-conspirators and former Hydroworld employees, Dolores Lopez and Daniel Corbin, testified to the first three requirements. They testified that, each day, employees at Hydroworld's retail locations recorded the amount and price of marijuana sold. *See id.* 803(6)(A). They indicated that these records were made and kept as a regular part of Hydroworld's sales activities. *See id.* 803(6)(B)–(C). As Corbin explained, employees were required to keep the logs to track the amount sold and to guard against theft.

Lopez and Corbin were qualified to testify to these conditions. *See id.* 803(6)(D). "When a witness is used to lay the foundation for admitting records under Rule 803(6), all that is required is that the witness be familiar with the record keeping system." *United States v. Ramer*,

883 F.3d 659, 678 (6th Cir. 2018) (quoting *United States v. Coffman*, 574 F. App'x 541, 556 (6th Cir. 2014)). Lopez regularly audited these records for Trevino, and Corbin was personally responsible for recording sales. That demonstrates adequate familiarity with the record keeping process here. It does not matter whether Lopez and Corbin personally prepared or reviewed each and every one of the individual sales records used to produce the summary charts. We have previously rejected the argument that "only those individuals who play a role in the creation or compilation of records can be used to lay the requisite foundation." *United States v. Hathaway*, 798 F.2d 902, 906 (6th Cir. 1986).

Finally, Trevino has failed to show any "lack of trustworthiness" in the underlying records. *See* Fed. R. Evid. 803(6)(E). To streamline the trial, the district court held a pretrial hearing where officers involved with the seizure of the sales records testified as to foundation. Trevino admits that the officers "authenticated . . . where and when [the records] were found."

The agent responsible for creating the summary charts based on those records testified at trial. Trevino argues that this was insufficient because this agent "did not work [at Hydroworld] as an employee" and "did not prepare her summaries in conjunction with individuals who did." But this argument conflates the requirements of Rule 803(6) with those of Rule 1006. Trevino cites no authority to support his apparent suggestion that an individual who compiles business records to create a Rule 1006 summary must also be a qualified witness for purposes of the business records exception. Lopez and Corbin were the qualified witnesses for Rule 803(6) purposes here.

Trevino also says that the records may have contained duplicate sales, but he points to no specific evidence of double-counting. The witness who prepared the summary chart testified that she eliminated any duplicates. Trevino has failed to identify any circumstances that suggest a lack of reliability in the sales logs.[12] Therefore, the underlying records would have been admissible under Rule 803(6), and it was not error to admit the summary charts.

---

[12]To the extent that Trevino's concern about duplicate sales records is also a challenge to the accuracy of the summary charts, *see Moon*, 513 F.3d at 545, his argument is equally unavailing.

VI.

Finally, Trevino challenges the procedural and substantive reasonableness of his sentence. Procedural reasonableness requires the sentencing judge to "properly calculate the guidelines range, treat that range as advisory, consider the sentencing factors in 18 U.S.C. § 3553(a), refrain from considering impermissible factors, select the sentence based on facts that are not clearly erroneous, and adequately explain why it chose the sentence." *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018). Substantive reasonableness asks whether "a sentence is too long (if a defendant appeals) or too short (if the government appeals)." *Id.* at 442. A claim of substantive unreasonableness is "a complaint that the court placed too much weight on some of the § 3553(a) factors and too little on others." *Id.*

A.

Trevino argues that the district court miscalculated his Guidelines range because it refused to reduce his offense level based on U.S.S.G. § 3E1.1(a). That provision calls for a two-level reduction "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). "The defendant bears the burden of showing that he has accepted responsibility." *United States v. Paulette*, 457 F.3d 601, 608 (6th Cir. 2006).

Our caselaw does not speak with one voice about the appropriate standard of review in appeals challenging the application of this Guideline. *United States v. Thomas*, 933 F.3d 605, 611 (6th Cir. 2019). Some cases call for de novo review when the district court applies the Guideline to uncontested facts, while others use a more deferential standard. *See id.* (discussing the split). We need not resolve the question here. Even under de novo review—the standard most favorable to Trevino—we find that the district court correctly denied a reduction for the acceptance of responsibility.

The acceptance of responsibility reduction "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." *United States v. Johnson*, 627 F.3d 578, 585 (6th Cir. 2010) (quoting U.S.S.G. § 3E1.1 cmt. n.2). However, "[i]n rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal

conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt." *United States v. Theunick*, 651 F.3d 578, 588 (6th Cir. 2011) (internal citation omitted) (quoting U.S.S.G. § 3E1.1 cmt. n.2).

This is not one of those rare situations. Trevino argues that he is entitled to this reduction because he "made no attempt to hide his ownership interest in Hydroworld" and testified at trial about how he "transitioned his business . . . into a medical marijuana company." But it is not enough that Trevino conceded some facts supporting his conviction. Even where a defendant does "admit substantial elements of the crime[] charged," a reduction is not appropriate if the defendant contests even one factual element of the offense. *United States v. Coss*, 677 F.3d 278, 292 (6th Cir. 2012) (explaining that the defendants "did not admit the requisite mens rea" and therefore had not accepted responsibility); *see, e.g.*, *Theunick*, 651 F.3d at 588; *Johnson*, 627 F.3d at 585; *United States v. Angel*, 355 F.3d 462, 478–79 (6th Cir. 2004). "[A] defendant must accept responsibility for all counts before he is entitled to a reduction." *United States v. Chambers*, 195 F.3d 274, 278 (6th Cir. 1999).

Here, Trevino went to trial, put the government to its proof, and contested facts essential to the charges against him. He disputed the number of plants that were attributable to him at various Hydroworld locations. That disputed evidence was relevant to various charges against him, such as manufacturing 100 or more plants of marijuana, maintaining a drug-involved premises, and possessing marijuana with the intent to distribute.

Moreover, the district court found that Trevino's conduct at trial, including "evasive" answers about the number of plants attributed to him, was not consistent with the acceptance of responsibility. During his testimony, Trevino suggested that marijuana plants grown at various Hydroworld facilities were not his own because another employee oversaw some of them. We have previously recognized that attempts to shift the blame for criminal conduct or to minimize one's role in a conspiracy can be inconsistent with the acceptance of responsibility. *See, e.g.*, *United States v. Austin*, 797 F. App'x 233, 246–47 (6th Cir. 2019); *United States v. Verduzco*, 558 F. App'x 562, 566 (6th Cir. 2014); *United States v. Gibson*, 985 F.2d 860, 867 (6th Cir. 1993).

Moreover, in the district court's view, Trevino demonstrated an attitude of "defiance" toward federal law.  Trevino suggests that this finding indicates that the district court impermissibly relied on Trevino's lack of remorse as one reason to deny the reduction.  But we have been clear that "[l]ack of true remorse is a valid consideration under § 3E1.1."  *United States v. Castillo-Garcia*, 205 F.3d 887, 889 (6th Cir. 2000); *see also United States v. Van Shutters*, 163 F.3d 331, 341 (6th Cir. 1998).  Trevino's lack of remorse was on clear display during his trial.  On the stand, Trevino expressly denied that he had done anything illegal.  And he repeatedly tried to suggest to the jury that his conduct was legal under state law, even though the court had already held such testimony irrelevant.

This record demonstrates that Trevino did not qualify for an acceptance-of-responsibility reduction.  We find that the district court properly calculated his Guidelines range and that his sentence was procedurally reasonable.

## B.

We review the substantive reasonableness of a criminal sentence for an abuse of discretion.  *Rayyan*, 885 F.3d at 442.  Our review is "highly deferential" to the sentencing judge's determination. *Id.*

The district court correctly calculated a Guidelines range of 188 to 235 months' imprisonment and imposed a sentence at the bottom end of that range (188 months).  A sentence within a properly calculated Guidelines range is presumptively reasonable.  *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008).

Trevino claims nonetheless that his sentence is too long.  He pointed the district court to the "changing landscape concerning marijuana."  But the district court's decision to reject Trevino's policy concerns and adhere to the advisory Guidelines was well within its discretion.  The court "fully recognize[d] that the landscape has changed in many states," but noted that "the federal landscape has never changed," and that the court itself it had "no policy disagreement" with the Guidelines on marijuana offenses.  The district court found that Trevino had displayed an attitude of "defiance" toward federal law during trial and during the preceding investigations; and it found a significant need to impose a sentence that would promote respect for federal drug

laws, reflect the seriousness of Trevino's offenses, and promote general deterrence. *See* 18 U.S.C. § 3553(a)(2). The court was not greatly concerned with a need for specific deterrence or to protect the public. *See id.* On balance, it found that a sentence at the bottom of the Guidelines range was appropriate.

The district court "considered the various sentencing factors," "gave a thorough and methodical rationale for its review," and "advanced a thoughtful explanation" for its conclusion. *United States v. Fleischer*, 971 F.3d 559, 572 (6th Cir. 2020). We see no basis to second-guess its decision. Trevino has not met the "heavy burden" required to rebut the presumption that his within-Guidelines sentence was substantively reasonable. *See United States v. Pritchett*, 790 F. App'x 786, 787 (6th Cir. 2020).

\* \* \*

For these reasons, we AFFIRM Trevino's sentence and convictions.