RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0226p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARLON LUNDY,

*Defendant-Appellant.*

> No. 22-3686

───────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:20-cr-00078-1—John R. Adams, District Judge.

Decided and Filed: October 10, 2023

Before: KETHLEDGE, THAPAR, and MATHIS, Circuit Judges.

───────────────

**COUNSEL**

**ON BRIEF:** Patrick J. Hanley, Covington, Kentucky, for Appellant. Daniel R. Ranke, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

───────────────

**OPINION**

───────────────

THAPAR, Circuit Judge. Marlon Lundy pulled out a 9-millimeter pistol, chambered a round, and pointed the gun at Alyssa Kirk, the mother of his children. Minutes later, Kirk told the police what happened. An officer recorded her statement on his bodycam, and the government played the recording at Lundy's trial. On appeal, Lundy argues the district court shouldn't have let the jury hear Kirk's recorded statement. We disagree and affirm.

I.

A.

Alyssa Kirk planned to spend Saturday night visiting her friend, Courtney Ernst. What should have been a pleasant evening soon became anything but. Late that night, an intoxicated Marlon Lundy forced his way into Ernst's home. Ernst's neighbor called 911 after hearing "a woman crying" and someone "being thrown around." R. 110, Pg. ID 842.

Local police responded, but Lundy left before they arrived. Kirk and Ernst told the officers that Lundy drove off in a red Pontiac. Officers Martin and Brown advised the women to lock their doors and call 911 again if Lundy returned. Then the officers began looking for Lundy.

Their search was soon interrupted. Roughly fifteen minutes after leaving Ernst's home, the police received another call. Lundy had returned—this time, with a gun. Officer Martin rushed back to the house and arrived two minutes after the second call. He activated his bodycam and recorded his conversation with Kirk and Ernst. The women told Officer Martin that Lundy pointed the gun at them, loaded it, and threatened to kill them. The following exchange took place in front of Kirk and Lundy's young children:

| | |
|---|---|
| Courney Ernst: | He came back . . . |
| Officer Martin: | So who saw a gun? |
| Alyssa Kirk: | We all did. |
| Courtney Ernst: | All of us. And he cocked it back too. |
| Alyssa Kirk: | In my face. |
| Courtney Ernst: | Literally. |
| Officer Martin: | In your face? |
| Alyssa Kirk: | [Nods.] |
| Officer Martin: | And what did he say? |
| Courtney Ernst: | He said 'anybody could get it,' that's what he said. |

| Alyssa Kirk: | Yeah, my adrenaline was so rushed, I can't even . . . |
|---|---|
| Officer Martin: | You don't seem very upset for someone who just had a gun pointed in their face. |
| Alyssa Kirk: | My whole . . . I'm trying not to like . . . My kids are around me. My body is shaky. I'm not really trying to flip out right now. I have adrenaline pumping through me at the second. |

Gov't Ex. 1 at 00:12–01:18.

While Officer Martin talked with Kirk and Ernst, Officer Brown found Lundy a few hundred feet from Ernst's home. Officer Brown stopped Lundy and frisked him for weapons. Finding none, the officer looked through the window of the red Pontiac. A loaded 9-milimeter pistol sat in plain view on the passenger's seat. Officer Brown also found a bag of drugs on the ground under Lundy's car. The officer secured the weapon and drugs, read Lundy his *Miranda* rights, and drove Lundy to jail for booking.

During booking, Lundy was permitted to make a phone call. An officer overheard Lundy say that "the gun was his, but the drugs were not." R. 110, Pg. ID 852–53. Lundy also told a different officer that he'd take the gun charge because "it's mine." *Id.* at 868; Gov't Ex. 2.3 at 00:04–00:15.

### B.

The United States charged Lundy with possessing a firearm as a felon. *See* 18 U.S.C. §§ 922(g)(1), 924(a)(2). Before trial, the government informed the court that it intended to introduce Officer Martin's bodycam footage of his conversation with Kirk. The government also planned to have Officer Martin testify about that conversation.

Lundy objected. He argued that because Kirk was not going to testify, her out-of-court statement was barred by the Federal Rules of Evidence and the Sixth Amendment's Confrontation Clause. The district court overruled these objections, and the jury heard Kirk's statement. Based on this and other evidence, the jury found Lundy guilty. Lundy appeals.

II.

On appeal, Lundy reasserts the same objections he raised below. First, he claims Kirk's out-of-court statement is inadmissible hearsay. Second, Lundy argues the Confrontation Clause prohibited the jury from hearing the statement. Both claims are wrong.

A.

Start with Lundy's hearsay challenge.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). The Federal Rules of Evidence generally prohibit hearsay evidence. Fed. R. Evid. 802. That's because hearsay statements are deemed less reliable. Unlike in-court witnesses, out-of-court declarants aren't sworn to tell the truth, aren't tested by cross-examination, and aren't available for the jury to evaluate their demeanor. *California v. Green*, 399 U.S. 149, 158 (1970); 2 Kenneth S. Broun et al., McCormick on Evidence § 245 (Robert P. Mosteller ed., 8th ed. 2020).

But some hearsay statements are "made under circumstances that tend to assure reliability." *Chambers v. Mississippi*, 410 U.S. 284, 299 (1973). So the Federal Rules include several exceptions to the hearsay ban. *See* Fed R. Evid. 803, 804. One is for "excited utterance[s]" made while the declarant is under the stress of a startling event. Fed. R. Evid. 803(2). In such circumstances, the declarant hasn't had time to reflect on the event described. And people are less likely to lie about an event if they haven't had time to reflect on it. *See Navarette v. California*, 572 U.S. 393, 399–400 (2014); *Miller v. Stovall*, 742 F.3d 642, 650 (6th Cir. 2014).

That exception governs Lundy's appeal. The district court admitted Kirk's statement to Officer Martin that Lundy had returned with a gun. That statement is certainly "hearsay"—Kirk made the statement out of court, and the government used it at trial to prove that Lundy possessed a gun. *See* Fed. R. Evid. 801(c). The district court nevertheless admitted Kirk's

statement after applying the "excited utterance" exception.[1]  We review this decision for abuse of discretion.  *See United States v. Trevino*, 7 F.4th 414, 423 (6th Cir. 2021).

The excited-utterance exception applies if three conditions are met:  (1) "there must be an event startling enough to cause nervous excitement," (2) "the statement must be made before there is time to contrive or misrepresent," and (3) "the statement must be made while the person is under the stress of the excitement caused by the event."  *United States v. Davis*, 577 F.3d 660, 669 (6th Cir. 2009) (quoting *Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1057 (6th Cir. 1983)).  Collectively, these three inquiries guide our analysis of the "ultimate question"—whether the declarant spoke before she had time to calm down, reflect, and lie about or otherwise misstate what happened.  *United States v. Arnold*, 486 F.3d 177, 184 (6th Cir. 2007) (en banc) (quotation omitted).

Kirk's statement checks all three boxes.

1.

First, Kirk spoke with Officer Martin after Lundy forced his way inside the home and pointed a loaded gun at her.  That's undoubtedly a "startling event."  Fed. R. Evid. 803(2); *United States v. Schreane*, 331 F.3d 548, 564 (6th Cir. 2003).  So the first requirement is easily met.

2.

Next, Kirk made her statement "before there [was] time to contrive or misrepresent" what happened.  *See Davis*, 577 F.3d at 669.  No rigid rule dictates how long is long enough to contrive or misrepresent.  Instead, the timeline varies based on factors like the intensity of the startling event and the age of the person giving the statement.  *See Haggins*, 715 F.2d at 1057–58; *United States v. Alexander*, 331 F.3d 116, 122–23 (D.C. Cir. 2003).

---

[1]The district court also admitted the statement under the "present sense impression" exception.  *See* Fed. R. Evid. 803(1).  Because we find the statement was properly admitted under the excited-utterance exception, we need not address this alternative basis for admissibility.

This case is not a close call. A drunk person forcing his way inside and shoving a loaded gun in your face—in front of your young children—is on the higher end of the startling-event spectrum. *Compare United States v. Baggett*, 251 F.3d 1087, 1089–91, 1090 n.1 (6th Cir. 2001) (several spousal beatings over three days), *and Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 379 (6th Cir. 2009) (watching a tractor-trailer strike and kill a co-worker), *with Davis*, 577 F.3d at 664, 669 (seeing a thought-to-be criminal across the street with a gun), *and United States v. McCullough*, 150 F. App'x 507, 509–10 (6th Cir. 2005) (witnessing a friend get arrested). That means it would have taken Kirk a while to cool down, reflect on the event, and misrepresent what happened. But here, Kirk made her statement "within minutes" of Lundy threatening her. R. 74, Pg. ID 650; *cf. United States v. Price*, 58 F. App'x 105, 107 (6th Cir. 2003) (holding that a statement made "within minutes" satisfied the second excited-utterance factor). With such a short wait after such a startling event, Kirk had a "reasonable basis for continuing to be emotionally upset." *Arnold*, 486 F.3d at 185 (cleaned up). Indeed, we've admitted statements made much longer after similarly startling events. *Cf. id.* at 185–86 (applying the excited-utterance exception to a statement made twenty-one minutes after being "threatened . . . with a gun" (cleaned up)); *Haggins*, 715 F.2d at 1058 (one and a half hours); *United States v. Green*, 125 F. App'x 659, 662 (6th Cir. 2005) (three hours).

To all this, Lundy protests that the record doesn't establish a precise timeline for Kirk's statement. That's both incorrect and irrelevant. As an initial matter, our precedent doesn't require "a time line showing precisely when the threatening event occurred or precisely how much time there was for contrivance." *Arnold*, 486 F.3d at 185. Either way, the record in this case is sufficiently clear: Officer Martin testified under oath that about 15 minutes passed between him leaving the residence the first time and returning after the second 911 call. Other evidence—including Officer Brown's testimony, 911 call logs, and timestamped bodycam footage—corroborates this timeline. Lundy had returned and threatened Kirk in the interim, so no more than 15 minutes could have passed between the startling event and Kirk's statement. *Id.* Thus, there was not enough time for Kirk to contrive or misrepresent.

3.

Finally, the district court did not abuse its discretion by finding that Kirk was still under the stress of the event. Kirk said as much. In her words, "My body is shaky . . . I have adrenaline pumping through me at the second." Gov't Ex. 1 at 01:04. And this court has held that such testimony suffices to prove ongoing stress. *See Davis*, 577 F.3d at 669. True, Officer Martin didn't think she looked particularly frightened at the time. But Officer Martin later qualified this statement in his trial testimony. There, he explained that Kirk is a repeat domestic violence victim, which could have impacted her reaction. Officer Martin also recognized that Kirk was trying to remain calm in front of her children. Even if Officer Martin hadn't backed off his earlier statement, Kirk's and Officer Martin's conflicting testimony would show—at most—that there were multiple ways to view the evidence. The district court didn't abuse its discretion in deciding to credit one of them.

Our decision in *Biegas* is directly on point. 573 F.3d at 378–81. Minutes after witnessing a tractor-trailer hit, dismember, and kill his co-worker, Nick Cohen told the driver that he'd told his co-worker to get out of the road. *Id.* Cohen later testified that he was screaming, crying, and "in a state of shock at the time." *Id.* at 380–81. The truck driver, by contrast, testified that Cohen "seemed happy" and "not agitated." *Id.* at 380. Despite the conflicting testimony, we held that the district court didn't abuse its discretion by admitting Cohen's out-of-court statement as an excited utterance. *Id.* at 380–81. Why? Because "[o]nly a few minutes had elapsed following an unusually horrific [incident], and Cohen's own testimony was that he was in a state of shock." *Id.* at 380. So too here.

In sum, all three excited-utterance conditions are met. Thus, the district court didn't abuse its discretion by admitting Kirk's out-of-court statement.

B.

What about Lundy's constitutional argument? Although we review that claim de novo, it fares no better. *United States v. Johnson*, 581 F.3d 320, 325 (6th Cir. 2009).

The Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, the Supreme Court clarified that this language only reaches "testimonial" statements. 541 U.S. 36, 53–54 (2004). That's because only testimonial statements "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821 (2006) (citing *Crawford*, 541 U.S. at 51). Thus, with a few exceptions, the Confrontation Clause only forbids the government from introducing testimonial hearsay statements against the accused.

But we need not concern ourselves with any exceptions: Kirk's statement to Officer Martin was nontestimonial, so it doesn't implicate the Confrontation Clause. A statement is "testimonial" when its "primary purpose" is to "creat[e] an out-of-court substitute for trial testimony." *Michigan v. Bryant*, 562 U.S. 344, 358 (2011). A classic example is a formal police interrogation intended to establish the facts of a crime committed well in the past. *Davis*, 547 U.S. at 825–26. Compare that, for instance, with a 911 call about an unfolding and urgent situation. Even if the same information is conveyed in both discussions, the Confrontation Clause treats the two differently. Why? Because the "primary purpose" of the 911 call isn't to "create a record for trial," but instead to help first responders resolve an "ongoing emergency." *Bryant*, 562 U.S. at 358. In other words, the 911 caller isn't acting as a "witness[]." U.S. Const. amend. VI. That's why the Court has deemed "nontestimonial" all statements that are made primarily to help police address an ongoing emergency. *Davis*, 547 U.S. at 822; *Bryant*, 562 U.S. at 361, 370.

That rule applies here. Lundy—a convicted and armed felon—threatened Kirk mere minutes before Officer Martin arrived. When Kirk told the officer what happened, Lundy's location was unknown. Nobody knew if or when he'd return—or what more he might do. These are strong indicators that the "primary purpose" of Officer Martin's interrogation was to help the police "meet an ongoing emergency." *Bryant*, 562 U.S. at 373–76 (quotation omitted).[2]

---

[2]Lundy makes much of the fact that police stayed at the residence for half an hour. But that doesn't matter: the government only introduced statements made in the first couple minutes of the encounter, before Lundy had been apprehended and while the emergency was still ripe. Put differently, even if the nontestimonial conversation

It's easy to see why. Officer Martin's questions—like "So who saw a gun?" and "What did he say?"—allowed him "to assess the situation, the threat to [his] own safety, and possible danger to the potential victim and to the public." *Id.* at 376 (quotation omitted). Therefore, Kirk's statement was nontestimonial, and the Confrontation Clause doesn't apply.

 We affirm.

---

later "evolve[d] into testimonial statements," there's no Confrontation Clause problem because the later statements weren't introduced at trial. *Bryant*, 562 U.S. at 365 (quoting *Davis*, 547 U.S. at 828).